UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| ANNE L. WOLFE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:12-CV-374-CAN |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

On July 11, 2012, Plaintiff Anne Wolfe ("Wolfe") filed a complaint in this Court

requesting reversal or remand of the decision of the Commissioner denying Social Security

Disability Insurance Benefits ("DIB"). On November 5, 2012, Wolfe filed her opening brief and,

on February 11, 2013, Defendant Acting Commissioner of Social Security, Carolyn W. Colvin

("Commissioner") responded. Wolfe filed a reply brief on February 25, 2013. This Court may

enter a ruling in this matter based on the parties' consent, 28 U.S.C. § 636(c), and 42 U.S.C. §

405(g).

**I.      PROCEDURE**

In November of 2007, Wolfe filed a Title II application for DIB, alleging disability

caused by peripheral neuropathy[2] and a history of colon cancer. Wolfe alleged a disability onset

date of June 21, 2007. Her claims were initially denied on March 6, 2008, and also on

reconsideration on May 22, 2008. Wolfe appeared at a hearing before an administrative law

judge ("ALJ") on March 3, 2010.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule
25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Commissioner Michael J.
Astrue as Defendant in this suit.

[2] Peripheral neuropathy is dysfunction of one or more nerves that can cause loss of sensation, pain, muscle
weakness, slowed reflexes, and constriction or dilation of blood vessels. *Peripheral Neuropathy, in The Merck
Manual of Diagnosis and Therapy* 1903-1906 (Mark H. Beers et al. eds., 18th ed. 2006).

On April 2, 2010, the ALJ issued a decision holding that Wolfe was not disabled, as defined in the Social Security Act, from June 21, 2007 through the date of the decision. Wolfe requested review by the Appeals Council on May 3, 2010 and the request was denied on May 14, 2010, making the decision of the ALJ the final decision of the Commissioner of Social Security. *See Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005); 20 C.F.R. § 404.981.

II.     ANALYSIS

    A.     Facts

Wolfe was 48 years old at the alleged onset and 51 years old on the date of the ALJ decision. She is a college graduate with a degree in business administration. Her past relevant work experience includes employment as an administrative assistant, an office manager, and a business analyst. Immediately before the onset of her alleged disability, she worked as a business analyst at NAL Worldwide.

Wolfe was diagnosed with colorectal cancer in June 2006. She continued to work as a business analyst while undergoing surgery and chemotherapy and worked from home from about September 2006 through March 2007. She was diagnosed with neuropathy secondary to chemotherapy on June 12, 2007. On June 21, 2007, Wolfe stopped working and began receiving disability benefits from her employer.

Wolfe complains of constant pain in her feet up to her ankles and hands up past her wrists. She describes the pain and numbness as "zinging," usually burning at night, and a loss of sensation and ability to detect temperature. She alleges occasional stumbling when walking, trouble standing for prolonged periods due both to pain and balance, trouble grasping and holding onto objects, and a loss of dexterity and fine finger movement. She also complains of

side effects from her pain medications, including grogginess, loss of concentration, slowed thinking, poor memory, and confusion.

## 1. Claimant's Hearing Testimony

During the March 3, 2010 hearing before the ALJ, Wolfe testified that she left her job when her hands went numb and she could no longer type on the computer. She stated that she has to take baths instead of showers because she would fall in the shower if she tried to stand. She claimed that she can sit but her hemorrhoid problem requires her to get up and move around every few hours. She also said she cannot feel her fingers so she can no longer type, sew, play piano, or detect temperature, as in the case of bathwater.

Wolfe further testified that she sleeps about 10-12 hours per day total, but for no more than 3 hours at a time due to excruciating burning pain in her feet. She alleged that she cannot manipulate buttons or zippers to dress herself and must have her husband wash and brush her hair. She indicated that she can go to the grocery store and ride in a cart while her husband grabs the food they wish to purchase. She said she can microwave food and get cereal, but cannot cook or do dishes. She also stated that she cannot do laundry but sometimes helps her husband sort the laundry by telling him when he puts things in the wrong pile.

Wolfe testified that the pain in her feet and hands feels like humming and "thousands of tiny rocks, sharp rocks, shoving into your foot." (Tr. 55.) She also described a burning in her feet at night that feels like they are on fire and blistering from the heat. She indicated that she could walk for a total of 30-40 minutes over the course of an 8-hour day and stand for about the same period of time. She testified that she could sit for approximately 4-5 hours, but would require at least a 2-3 hour nap in an 8-hour day.

Wolfe testified that she cannot drive because she cannot work the pedals with her foot braces, but that she could probably use the steering wheel by grabbing it with the inside of her hands. When asked about the braces, she testified that they were prescribed 6-7 months prior to the hearing because she kept breaking her toes and getting her feet stuck under doors. She testified that she began using a cane about two years before the hearing because the doctor prescribed it after she fell down at church praying. The ALJ did not ask any questions about the side effects of her medication or her alleged cognitive impairments.

### 2.    Medical Evidence of Dr. Case and Dr. Banas

Wolfe began seeing Rebecca Case, M.D., prior to her cancer diagnosis, and Wolfe was still being treated by Dr. Case at the time of the hearing. Dr. Case first noted Wolfe's neuropathic pain on June 12, 2007. Later that month, at a follow-up visit, Dr. Case remarked that the neuropathic pain persisted despite the pain medication and numbness and tingling had developed in the tips of Wolfe's fingers. Dr. Case reported that "this has caused her significant problems because the work that she does is all computer entry related." (Tr. 240.) On June 22, 2007, Dr. Case recommended that Wolfe stop working because her peripheral neuropathy was "affecting her ability to walk without stumbling as well as doing the data entry, which is the bulk of her job." (Tr. 239.) In July 2007, Dr. Case noted bilateral muscle atrophy of the forearms and calves and decreased grips at 2/5 "at best." (*Id*.) As a result, she referred Wolfe to Thomas M. Banas, M.D., a neurologist at the Fort Wayne Neurological Center.

Wolfe met with Dr. Banas on September 11, 2007. His sensory examination indicated decreased sensation to temperature and vibration as well as reduced motor strength in her lower extremities and an inability to stand on her heels and toes. (Tr. 349.) He found normal motor strength in Wolfe's upper extremities. He ordered an increase in the dosage of Elavil—one of

Wolfe's nerve pain medications. Dr. Banas performed an electromyography ("EMG") study on September 24, 2007, which indicated peripheral neuropathy. A nerve conduction study performed that day found reduced reaction times and decreased reaction strength in Wolfe's feet. (Tr. 218.) The upper extremity results indicated that Wolfe's motor function was normal, but her sensory nerves had diminished response times and decreased reaction strength. (*Id*.) On October 17, 2007, Wolfe returned to the Fort Wayne Neurological Center complaining of tiredness and confusion on the higher dose of Elavil. The office visit record stated that Wolfe was "unable to do work as business analyst" and noted decreased ability to detect vibration and temperature, loss of sensation, and pain in her feet.[3] (Tr, 354.)

In late 2007, Dr. Case noted that "the Lyrica[4] clearly makes [Wolfe] think a bit slower, but that is a fair trade off for increased pain relief." (Tr. 301.) Wolfe continued to see Dr. Case regularly and Dr. Case documented the progression of the neuropathy. On October 13, 2008, Dr. Case noted Wolfe's problems with tripping and falling "on occasion" and "less fine motor function of her hands and fingers." (Tr. 262.) She indicated that Wolfe's pain control was reasonable but that the Lyrica "messes with her ability to think clearly," although, because it helps with her pain, "she is willing to take it." (*Id*.) Dr. Case also recorded weakened grip strength and foot drop so she prescribed foot drop splints for both feet to help with gait. In early 2009, Dr. Case indicated that Wolfe had foot drop with a "wide slow cautious gait" and muscle atrophy of the lower legs. (Tr. 361.) Dr. Case reported that when Wolfe was "out on her feet and working in the yard a little bit, more than normal," her pain was worse. (Tr. 360.) On July 16, 2009, Wolfe reported to Dr. Case that her feet and hands felt like they had a layer of fabric

---

[3] Wolfe describes this as a visit to Dr. Banas and the conclusions as those of Dr. Banas, (Doc. No. 15 at 4), but the ALJ noted that the handwriting and signature were not completely legible and the handwriting did not match other instances of Dr. Banas's writing (Tr. 27). However, the ALJ did not resolve the factual discrepancy, instead noting that "whether an opinion or allegation by the claimant, the statement is not supported by contemporary narrative support, and is inconsistent with the weight of the medical evidence of record." (Tr. 27.)
[4] Another of Wolfe's nerve pain medications.

separating them from other objects—a phenomenon known as stocking and glove distribution. (Tr. 358.) In late 2009, Dr. Case documented a change in the character of Wolfe's pain from tingling pain to feeling like a stake was being stabbed into the balls of her feet. Dr. Case also reported increased difficulty walking and further limitations on activity.

### 3. Medical Evidence of Agency Experts

Wolfe had a consultative examination with Kinzi Stevenson, M.D., for Indiana Disability Determination Services on February 2, 2008. Dr. Stevenson opined that Wolfe "can dress and feed herself," "stand for 10 minutes at one time," "has no difficulty in sitting," "is able to lift 10 pounds," "can shop without any problem," and "can sweep, mop, wash dishes and climb stairs at short intervals," but is unable to "vacuum, cook, or mow grass." (Tr. 251.) Dr. Stevenson noted that Wolfe "ambulates with moderate difficulty" but has "no difficulty getting on and off the exam table or up and out of the chair" and can "take her shoes and socks on and off." (Tr. 252.)

Dr. Stevenson observed that Wolfe "has a normal steady gait," "ambulates with her legs overextended and stiff," and has "a small amount of footdrop," but that Wolfe did not use an assistive devise for ambulation. (Tr. 253.) Dr. Stevenson recorded handgrip strength of 3/5 bilaterally but noted no muscle atrophy. The straight legs tests were negative and Dr. Stevenson recorded full range of motion. Wolfe was able to raise on her toes but not walk on her toes or heels, nor walk heel-to-toe, and she had problems with balance. Dr. Stevenson documented appropriate mood and affect, decreased motor strength of 4/5 in upper and lower extremities bilaterally, hypersensitivity to light touch in her feet and hands, decreased vibration in her feet and heels, and an inability to perform the heel-to-shin test. (*Id.*)

Dr. Stevenson concluded that Wolfe had "no limitation in sitting, seeing, hearing or speaking" but there was "limitation in walking, lifting and carrying secondary to the patient's

peripheral neuropathy. . . ." (Tr. 254.) One month later, Dr. Stevenson recorded an addendum stating that Wolfe had "good finger to thumb opposition on both hands" and "no decreased range of motion in the joints." (Tr. 257.) Additionally, Dr. Stevenson added that there "did not appear to be any limitation in reaching, handling, or grasping." (*Id*.)

A state agency expert, Antoinette Dobson, M.D., completed a Physical Residual Functional Capacity ("RFC") Form on March 6, 2008, based on a review of the available record at that time. She opined that Wolfe could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk for a total of about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and push and/or pull to an unlimited extent. (Tr. 291-98.) Although she found no manipulative limitations, she reported that there was no treating source conclusion about the claimant's limitations or restrictions that significantly differed from her findings. (Tr. 292-93.)

### 4.      Decision of the Administrative Law Judge

The ALJ found that Wolfe met the insured status requirements through December 31, 2011. He found that Wolfe had not engaged in substantial gainful activity since June 21, 2007, the alleged onset date. The ALJ identified the severe impairments of peripheral neuropathy and a history of colon cancer. He also noted that Wolfe alleged cognitive impairments but that there was no separate "psychological medically determinable impairment" to support her claims. (Tr. 23.) He determined that Wolfe does not have an impairment meeting or medically equaling an impairment listed in the Social Security regulations.

The ALJ concluded that Wolfe had the residual functional capacity ("RFC") to perform sedentary work under 20 C.F.R. § 404.1567(a) except that she could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl;

and must avoid concentrated exposure to vibrations and unprotected heights. The ALJ then provided a summary of Wolfe's hearing testimony and concluded that her testimony was not credible because it was not consistent with the medical record. Based on the testimony of the vocational expert ("VE"), the ALJ determined that Wolfe is capable of performing her past relevant work as a business analyst.

## A.     Standard of Review

The Social Security Administration follows a five-step sequential analysis when determining if a particular claimant is disabled. The ALJ must consider whether: (1) the claimant is presently employed or engaged in substantial gainful activity; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations; (4) the claimant's residual functional capacity leaves her unable to perform past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005); 20 C.F.R. § 404.1520. A finding of disability requires an affirmative answer at either step three or step five. *Id*. at 352. The burden of proof is on the claimant until step five, when the burden shifts to the Commissioner to demonstrate that there are a sufficient number of jobs in the national economy that the claimant could perform. *Id*. (*citing Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004)).

In reviewing disability decisions of the Commissioner of Social Security, the Court will affirm the ALJ's decision if it is supported by substantial evidence and free of legal error. *See* 42 U.S.C. § 405(g); *Briscoe*, 425 F.3d at 351. "Substantial evidence" is more than mere scintilla; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*citing Richardson v. Perales*, 402

U.S. 389, 401 (1971)). A reviewing court is not to substitute its own opinion for that of the ALJ or to re-weigh the evidence, but the ALJ must have built a logical bridge from the evidence to his conclusion. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). An ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The ALJ must "sufficiently articulate [his] assessment of the evidence to assure [the Court] that the ALJ considered the important evidence . . . [and to enable the Court] to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*citing Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)). However, an ALJ need not provide a "complete written evaluation of every piece of testimony and evidence." *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004) (*citing Diaz*, 55 F.3d at 308). An ALJ's legal conclusions are reviewed *de novo*. *Haynes*, 416 F.3d at 626.

**B.      Issues for Review**

Wolfe contends that the ALJ (1) erred in finding that she did not meet or medically equal Listing 11.14, and (2) failed to make a proper RFC determination by failing to articulate the weight assigned to the medical source opinions, improperly discounting the credibility of Wolfe's hearing testimony, and omitting an entire line of evidence regarding Wolfe's cognitive complaints and upper extremity limitations.

**1.      The ALJ's determination that Wolfe's severe impairments did not meet or medically equal Listing 11.14 is not supported by substantial evidence.**

At the third step of the five-step analysis of a claimant's disability, the ALJ determines if the claimant has an impairment or combination of impairments that meets or equals one of the impairments in the Listing of Impairments. 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1; *see also Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). If a claimant meets the criteria for a disabling impairment under the listings, she is presumptively disabled and the

analysis ends. 20 C.F.R. § 404.1525(a); *see also Barnett*, 381 F.3d at 668. In his decision, the ALJ "must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett*, 381 F.3d at 668-69. The ALJ must also evaluate evidence that is favorable to the claimant. *See Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) ("[the ALJ's] failure here to evaluate any of the evidence that potentially supported [claimant's] claim does not provide much assurance that he adequately considered [the] case"); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (case remanded because the ALJ failed to mention the strongest evidence supporting a disability finding).

The relevant listing in this case, Listing 11.14, is for peripheral neuropathies with significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station, in the form of paresis, paralysis, tremor, involuntary movements, ataxia, or sensory disturbances in spite of prescribed treatment. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.14; § 11.04B; § 11.00C. Furthermore, "[t]he assessment of impairment depends on the degree of interference with the use of fingers, hands, and arms." *Id*. at § 11.00C.

Wolfe claims that the medical evidence of record contradicts the ALJ's finding that "there is no evidence of significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." (Doc. No. 15 at 11.) Furthermore, she asserts that the ALJ improperly relied solely on the report of the consultative examiner and "picked and chose" from that report, ignoring findings that would have supported the Listing. (*Id*. at 12.)

The ALJ's analysis stated that "[t]he consultative examiner noted a normal and steady gait, no use of an assistive device, and no limitation in reaching, handling, or grasping . . . ." (Tr.

24.) In addition, the ALJ remarked that Dr. Case had diagnosed Wolfe's peripheral neuropathy and chronicled her symptoms. He further stated that, because "the claimant had developed numbness and tingling in her extremities and pain in her hands and feet preventing walking" prior to the February 2, 2008, consultative examination, which was "similar to those reported and found by Dr. Case around the time of the hearing," the opinion of the examiner was "composed at a time when the claimant's symptoms were substantially similar to those alleged at hearing." (*Id.*)

On the other hand, the Commissioner argues that the ALJ properly relied on the expert medical opinion of Dr. Kinzi Stevenson, the consultative examiner who examined Wolfe in February 2008 and whose opinion was consistent with the opinions of Dr. Dobson and Dr. Sands, the agency expert physicians. (Doc. No. 21 at 5-6.) Specifically, the Commissioner contends that the state agency medical consultants may conclusively determine medical equivalence.

The Court is not persuaded. As Wolfe correctly points out, neither Dr. Sands' nor Dr. Dobson's reports provided any substantive discussion of the degree of disorganization of motor function, or specifically mentioned the Listing 11.14 criteria at all. Furthermore, the ALJ failed to mention either Dr. Sands or Dr. Dobson in his discussion of the listing criteria and later afforded the RFC determination of Dr. Dobson only "some weight" as it was only "somewhat consistent" with the medical evidence of record. (Tr. 27.) The Court acknowledges that the state agency medical consultants may conclusively determine medical equivalence as the Commissioner suggests. *See Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (*citing Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989)). However, what matters for judicial review is not a possible rationale the ALJ may have used, but the reasons actually articulated by

the ALJ. *Jelinek v. Astrue,* 662 F.3d 805, 812 (7th Cir. 2011). The ALJ may not discuss only those facts that support his conclusion, but must address those that would support a finding of disability and explain why they do not. *See, e.g., Franklin v. Astrue,* No. 12–230, 2013 WL 652548, at *2-3 (S.D. Ind. Feb. 21, 2013); *see also Brindisi,* 315 F.3d at 786. Without such a logical bridge connecting the evidence of record to the conclusions of the ALJ, the Court cannot affirm that the decision of the ALJ was supported by substantial evidence.

Even if the ALJ determined that the findings of the agency experts were conclusive on the issue of meeting or medically equaling a listing, the ALJ did not sufficiently account for the length of time that passed between the consultative examination and agency expert determinations and the hearing. Dr. Stevenson examined Wolfe in February 2008, more than two years before the hearing in March 2010. After the consultative exam, Dr. Case continued to treat Wolfe for her peripheral neuropathy. Even if the medical opinions of Dr. Stevenson and Dr. Case were "similar" as of 2008, the ALJ failed to address any medical evidence subsequent to that exam. Similarly, Dr. Dobson completed the RFC Form in March 2008, without the benefit of the subsequent two years of medical data. Without a discussion of the medical evidence arising after Dr. Stevenson's examination and Dr. Dobson's opinion and an explanation as to why the ALJ did not find it persuasive, this Court has no way of determining whether the evidence was considered at all.

In addition, the ALJ failed to adequately articulate how the record evidence supports his findings. The reason articulated by the ALJ for finding that Wolfe's impairment did not meet the listing was "because the medical evidence of record does not reflect significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait or station, in spite of prescribed treatments." (Tr. 24.) This is

simply a restatement of the listing and not an explanation of how the ALJ reached a conclusion. The ALJ did not explain or identify evidence supporting his determination and build the requisite "logical bridge" from that evidence to his conclusions. *See Jelinek,* 662 F.3d at 812. The ALJ's failure to sufficiently explain his determination that Wolfe's severe impairments did not meet or equal a listing warrants a remand for further consideration of Wolfe's impairments. *See Steele,* 290 F.3d at 938; *Scott v. Barnhart,* 297 F.3d 589, 595 (7th Cir. 2002) ("failing to discuss the evidence in light of the Listings analytical framework leaves a court with grave reservations as to whether the ALJ's factual assessment adequately addressed the criteria of the listing"). This Court does not render an opinion as to whether Wolfe in fact meets or medically equals Listing 11.14, only that the ALJ should have articulated his analysis in greater detail.

> **2.      The ALJ's RFC determination is not supported by substantial evidence.**

In order to proceed with steps four and five of the five-step disability determination process, an ALJ must determine a claimant's residual functional capacity ("RFC"). An RFC is an administrative assessment of the maximum an individual can do despite the limitations imposed by her impairments. 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996). An RFC measures not only medically determinable impairments, but related symptoms, such as pain and side effects of medication. *Id.* An RFC analysis must include a thorough discussion and analysis of the objective medical evidence and other evidence, including the claimant's testimony regarding pain and functional limitations. SSR 96-8p, 1996 WL 374184, at *2. The ALJ must consider only limitations and restrictions attributable to medically determinable impairments. *Id.* The RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion" and the ALJ must "explain how any

material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id*. at *7.

> ### a. The ALJ failed to adequately articulate the weight applied to the medical opinions of Dr. Case and Dr. Banas, and failed to support the weight applied to Dr. Stevenson's medical opinion.

In making the RFC determination, the ALJ must determine and articulate the weight applied to each medical opinion. SSR 96-8p, 1996 WL 374184, at *7. A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (*citing Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010)); 20 C.F.R. § 404.1527(d)(2), SSR 96-6p, 1996 WL 374188, at *2 (July 2, 1996). An ALJ does not have to give controlling weight to a treating physician's opinion, but "must offer 'good reasons'" for discounting it. *Larson*, 615 F.3d at 749 (*citing* 20 C.F.R. § 404.1527(d)(2)). Even if an ALJ offers good reasons for not giving controlling weight to a treating physician's opinion, he must still decide what weight to give to that opinion. *Campbell*, 627 F.3d at 308 (*citing Larson*, 615 F.3d at 751); 20 C.F.R. § 404.1527(d)(2).

The ALJ must consider several factors when he does not give controlling weight to a treating source opinion, including (1) the examining relationship; (2) the treatment relationship, including the length, nature, and extent of treatment; (3) the opinion's supportability, including medical signs and laboratory findings; (4) its consistency; (5) the doctor's specialization; and (6) other factors, such as an understanding of disability programs and the extent to which the medical source is familiar with the other information in the case record. 20 C.F.R. § 404.1527(c); s*ee also Larson*, 615 F.3d at 751; *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); SSR 96-2p, 1996 WL 374188, at * 4 (July 2, 1996). A decision must contain specific reasons for the weight given to the treating source's medical opinion. SSR 96-2p, 1996 WL

374188, at *5; s*ee also Campbell*, 627 F.3d at 306. The reasons must be supported by the evidence in the case record and sufficiently specific to make clear to any subsequent reviewers the weight given to the treating source's medical opinion. *Id.*

Additionally, the Social Security Administration's regulations require that ALJs "must explain the weight given to the opinions" of state agency physicians. *McKinzey,* 641 F.3d at 891; 20 C.F.R. § 404.1527(f); SSR 96-6p, 1996 WL 374180, at *1 (July 2, 1996). Here, the ALJ failed to provide an adequate explanation of the weight given to the opinions of Dr. Stevenson and Dr. Dobson, and no explanation or discussion of the weight applied to the opinion of Dr. Sands. This is particularly troubling in light of the fact that the opinions were rendered over two years before the hearing, and without the benefit of an updated medical record. *See, e.g., Jelinek,* 662 F.3d at 812 (finding that the ALJ would be "hard-pressed to justify casting aside [the treating physician's] opinion in favor of these early state-agency opinions," which were two years old). Where, as here, there appear to be inconsistencies between the medical opinions, an ALJ "has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernible." *Barnett*, 381 F.3d at 669; 20 C.F.R. § 404.1527(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *4.

The only statements by the ALJ as to the weight accorded the various medical opinions were his assignment of "great weight" to Dr. Stevenson's opinion and "some weight" to Dr. Dobson's RFC determination. The weight given to the opinions of Dr. Case, Dr. Banas, and the other state expert, Dr. Sands, were not mentioned. The ALJ may have properly weighed the evidence and decided not to afford controlling weight to the medical opinions of Dr. Case and Dr. Banas, but because the weight that was applied was not articulated, this Court is not free to presume as much. Without an explanation as to the weight applied to the medical sources, even

the "very deferential" standard requiring the ALJ to "minimally articulate his reasons for accepting or rejecting evidence" is not met. *Landing v. Astrue*, No. 11-404, 2013 WL 1343864, at *7 (N.D. Ind. Apr. 3, 2013) (*citing Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004)); s*ee also* 20 C.F.R. § 404.1527(c)(2).

Without any discussion regarding the weight given to evidence provided by the treating physicians and agency experts, this Court cannot determine whether such reliance is reasonable. Moreover, this Court is not in a position to draw factual conclusions on behalf of the ALJ. Therefore, in light of these errors, remand is appropriate so that the ALJ can evaluate the proper weight for the opinions of Dr. Case, Dr. Banas, the consultative examiner, and the state agency reviewers, as well as articulate the reasons for his conclusions.

> **b.**     **The ALJ's determination that Wolfe's testimony was not credible is patently wrong.**

In considering the claimant's symptoms, an ALJ first determines whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's pain or other symptoms. Once the existence of a medically determinable physical or mental impairment that could reasonably produce the symptoms alleged has been established, the intensity, persistence, and functionally limiting effects of those symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to work. 20 C.F.R. § 404.1529; SSR 97-7p, 1996 WL 374186, at *1 (July 2, 1996). In order to make this determination, the ALJ must make a finding about the credibility of the claimant's statements about the symptoms and functional limitations. *Id*. Since symptoms, such as pain "sometimes suggest a greater severity of impairment than can be shown by medical evidence," when a decision fully favorable to the claimant cannot be made solely on the basis of objective medical evidence, the ALJ must carefully consider the claimant's statements about symptoms along with

the rest of the relevant evidence to reach a conclusion. *Id.* An individual's symptoms, including

pain, "will be determined to diminish the individual's capacity for basic work activities to the

extent that the individual's alleged functional limitations and restrictions due to symptoms can

reasonably be accepted as consistent with the objective medical evidence and other evidence in

the case record." *Id.* at *2.

 In this case, the ALJ determined that Wolfe's descriptions of her daily activities were "at

odds" with the findings of the consultative examiner and thus not credible. He stated that

> After careful consideration of the evidence, the undersigned finds that the
> claimant's medically determinable impairments could reasonably be expected to
> cause the alleged symptoms; however, the claimant's statements concerning the
> intensity, persistence and limiting effects of these symptoms are not credible to
> the extent they are inconsistent with the above residual functional capacity
> assessment.

(Tr. 26.)

Because the ALJ is "in the best position to determine a witness's truthfulness and forthrightness

. . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'"

*Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (*quoting Skarbek v. Barnhart*, 390 F.3d

500, 504-05 (7th Cir. 2004)) (internal quotations omitted). In evaluating a claimant's credibility,

the ALJ must "consider the entire case record and give specific reasons for the weight given to

the [the claimant's] statements." *Shideler*, 688 F.3d at 311 (*quoting Simila v. Astrue*, 573 F.3d

503, 517 (7th Cir. 2009)) (internal quotations omitted). On review, this Court determines

"whether the ALJ's determination was reasoned and supported." *Shideler*, 688 F.3d at 311

(*citing Elder*, 529 F.3d at 413). An ALJ may consider the claimant's daily activities in assessing

credibility, "but ALJs must explain perceived inconsistencies between a claimant's activities and

the medical evidence." *Pepper v. Colvin*, 712 F.3d 351, 368 (7th Cir. 2013) (*citing Jelinek*, 662

F.3d at 812).

The ALJ reported the results of Wolfe's EMG, Nerve Conduction Study, and MRI tests and concluded that "[t]he above objective evidence support the existence of the above listed severe impairments, but does not support limitations greater than those found in the above assessed residual functional capacity." (Tr. 26.) However, the ALJ did not explain how the test results contradicted Wolfe's hearing testimony, nor did he state that they were inconsistent with her testimony. The ALJ must explain how the objective medical evidence detracted from Wolfe's credibility. *See* SSR 96-7p, 1996 WL 374186, at *1. Furthermore, there is no medical opinion in the record explaining how the results of an EMG, Nerve Conduction Study, or MRI could be interpreted as a measure of functional limitation unless the ALJ made the medical determination based on the raw data of the results, which an ALJ may not do. *See Clifford*, 227 F.3d at 870.

The ALJ reiterated his conclusion that because Wolfe had complained of numbness and tingling in her extremities and pain in her hands and feet preventing walking of any great distance prior to her February 2, 2008, consultative examination, the opinion of the consultative examiner was "composed at a time when the claimant's symptoms were substantially similar to those alleged at hearing," and thus merited "great weight." (Tr. 27.) Because the ALJ did not reference or discuss Wolfe's medical records subsequent to the 2008 examination, this Court is unable to determine whether the ALJ properly considered all of the relevant medical evidence in making this determination. *See Zurawski*, 245 F.3d at 887. Because the ALJ determined that Wolfe was not entirely credible in large part because her statements were inconsistent with the findings of Dr. Stevenson, the issue requires remand. *See Ribaudo*, 458 F.3d at 584 (7th Cir. 2006).

This Court cannot conclude that the ALJ made a reasoned and supported credibility determination; thus, it is patently wrong and must be remanded. *See Shideler*, 688 F.3d at 311. This Court does not suggest that the ALJ's credibility determination was incorrect, but only that greater elaboration is necessary to ensure a full and fair review of the evidence. *See Zurawski*, 245 at 888.

**c.     The ALJ erred in failing to consider all of the relevant evidence of record relating to Wolfe's upper extremity and cognitive complaints.**

The RFC assessment "must be based on *all* of the relevant evidence in the case record." SSR 96-6p, 1996 WL 374184, at *5 (emphasis in original). The Seventh Circuit has consistently recognized that "meaningful appellate review requires the ALJ to articulate his reasons for accepting or rejecting entire lines of evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). When "there is reason to believe that an ALJ ignored important evidence—as when an ALJ fails to discuss material, conflicting evidence—error exists." *Walters v. Astrue*, 444 F. App'x 913, 917 (7th Cir. 2011) (*citing McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011); *Brindisi*, 315 F.3d at 786).

As part of an RFC determination, the ALJ must consider the "type, dosage, effectiveness, and side effects of any medication." SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). The ALJ did not credit Wolfe's complaints of cognitive impairment from side effects of medication despite his determination that the medications Wolfe reported taking "are generally consistent with the claimant's reports of her pain and side effects." (Tr. 26.) The ALJ decided that Wolfe's complaint of a loss of cognitive abilities was undermined by the fact that she was not on psychological medications, had not undergone any mental health treatment, and was found to be thinking clearly with appropriate affect and normal content and processes by her treating physician. (Tr. 23.) He also noted that Wolfe did not repeat her complaint of cognitive

functioning impairment at the hearing. (Tr. 23.) Additionally, he determined that because Wolfe believed that the slowed thinking caused by Lyrica was a fair tradeoff for the pain relief, "any loss of functioning is not significant." (Tr. 25.)

The ALJ appears to have mischaracterized the cognitive impairments complained of as a separate impairment, and not as side effects of the medication he determined to be generally consistent with her condition. Thus, failure to address the functional limitations created by the medication side effects was in error. Furthermore, the conclusion that the side effects of pain medication were not significant because Wolfe accepted the tradeoff is unsupported by medical evidence and constitutes an improper medical determination. *See, e.g., Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006); *Miller v. Chater*, 99 F.3d 972, 977 (10th Cir. 1996) (holding that "the ALJ overstepped his bounds into the province of medicine when he concluded that '[i]t would appear that if claimant did indeed experience the degree of side effects he has alleged, there should be evidence of efforts to prescribe a different medication regimen'").

The ALJ cited to the 2007 Nerve Conduction Study, EMG, and magnetic resonance imaging ("MRI") results in his RFC analysis. (Tr. 26.) He repeated the findings of the examinations and then concluded that "[t]he above objective evidence supports the existence of the above listed severe impairments, but does not support limitations greater than those found in the above assessed residual functional capacity." (*Id.*) As discussed above, however, because there is no medical opinion in the record explaining how the results of an EMG, Nerve Conduction Study, or MRI could be interpreted as a measure of functional limitation, reciting the test results does not bolster or explain how the ALJ reached his RFC determination. Notably, the ALJ stated that the claimant underwent a Nerve Conduction Study and EMG and then discussed only the results of the EMG. The Nerve Conduction Study notably indicated terminal latency

and decreased amplitudes in the upper extremity sensory nerves. (Tr. 218.) Thus, not only did citing the raw medical data fail to support the ALJ's RFC determination, some of the evidence he failed to discuss in his decision may have supported the claimant's assertion that she has functional limitations due to loss of sensation in her hands.

While the ALJ was not required to credit the evidence indicating Wolfe's alleged limitations regarding her upper extremities and her concentration issues, he was required to address that line of evidence and discuss why he did not include it in the RFC. By crediting only the medical opinion of Dr. Stevenson, the ALJ failed to discuss the other medical evidence documenting Wolfe's decreased grip strength and muscle atrophy in her arms.

Furthermore, in addition to failing to articulate the upper extremity and side effect complaints, the ALJ also failed to discuss them in his hypothetical questions posed to the vocational expert ("VE"). If the ALJ relies on the testimony of a VE, the hypothetical question posed to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record. *Indoranto v. Barnhart*, 364 F.3d 470, 474 (7th Cir. 2004). The VE testified that if the ALJ found Wolfe to be totally credible, there would be no jobs available to her. (Tr. 62.) Thus, the failure to either include or explain the omission of the upper extremity limitations and the side effects of her medications was harmful error and requires remand for further proceedings. *Indoranto*, 364 F.3d at 474.

I.      **CONCLUSION**

For the reasons stated above, this Court concludes that the ALJ's decision is not supported by substantial evidence. Therefore, this case is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

**SO ORDERED**.

Dated this 1st Day of July, 2013.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge
